JOHN F. WELCH vs. KEENE CORPORATION & another.[1]

No. 89-P-1200.

Norfolk. March 20, 1991. - August 5, 1991.

Present: SMITH, PORADA, & GREENBERG, JJ.

*Asbestos. Evidence*, Identity of manufacturer, Expert opinion, Chart, Experiment, Demonstration. *Negligence*, Manufacturer, Proximate cause, Duty to warn. *Damages*, Future earning capacity.

In a civil action brought against manufacturers of asbestos, seeking damages for injury resulting from the plaintiff's exposure to asbestos, the plaintiff sufficiently identified the defendants' products as those to which he had been exposed in his work environment [161-162], and sufficiently demonstrated that his exposure to the defendants' products was substantial and that their products caused his injury [162-163].

In a civil action, an issue not raised at trial could not be raised for the first time on appeal. [163-164]

At the trial of an asbestos products liability action there was no error in the judge's allowing certain expert testimony, the use of a summary chart of voluminous evidence, and presentation of a videotaped experiment that was relevant to the issues raised. [164-166]

In a civil action there was no error in the judge's instructions with respect to the plaintiff's past lost earnings. [166-167]

CIVIL ACTION commenced in the Superior Court Department on August 7, 1979.

---

[1]Owens-Illinois, Inc. Of the thirteen defendants named in the original and amended complaints, Welch waived or settled his claims against all manufacturers except Keene Corporation, Owens-Illinois, Inc., Eagle-Picher Industries, Inc., Owens-Corning Fibre Glass, Inc., H.K. Porter Company, The Celotex Corporation, and Fibreboard Corporation. After trial, Eagle Picher and Owens-Corning entered into postjudgment settlements with Welch. Porter and Celotex, having filed for protection under c. 11 of the Federal Bankruptcy Act, 11 U.S.C. §§ 105(a), 1101 et seq. (1988), obtained stays of their appeals. Keene was the successor to the "Baldwin-Hill" company. For the purposes of this case, Keene stipulated that it was liable for any damages found to be caused by Baldwin-Hill products.

The case was tried before *James P. Lynch, Jr.*, J.

*Kevin E. Young* for Keene Corporation.

*Peter J. Rubin* of Maine for Owens-Illinois, Inc.

*Albert P. Zabin* (*Christine M. Hayes* with him) for the plaintiff.

*Thomas L. Crotty, Jr.*, & *Joel G. Beckman*, for H. K. Porter Company, Inc., submitted a brief.

*Richard L. Neumeier, Thomas P. O'Reilly, Leonard F. Zandrow, Jr.*, & *Janet L. Maloof* for The Celotex Corporation, submitted a brief.

GREENBERG, J. John F. Welch brought this action against thirteen manufacturers of asbestos materials, among them the defendants Keene Corporation (Keene) and Owens-Illinois, Inc. (Owens), seeking damages for an injury resulting from his exposure to asbestos products between 1954 and 1976. On March 21, 1989, the case was submitted to a jury on special questions, several of which are germane to this appeal.[2] The jury returned a verdict of $878,566.55 for Welch against six of the defendants who then remained in the case, and found in favor of the defendant Fibreboard Corporation. Only Keene and Owens are presently before us on appeal (see note 1, *supra*). The defendants' first claim error in the

---

[2]Upon completion of the defendants' cases, the judge, after denying the defendants' motions for a directed verdict, dismissed various counts relating to Welch's tort based theories of recovery, including negligence and strict liability. He left for the jury the claim for breach of warranty of implied merchantability, using a series of special questions. The jury answered the first question, "Did Mr. Welch contract asbestosis?" in the affirmative. We recite the other questions pertinent to this appeal:

"*Q.2* Were asbestos-containing products manufactured by the [defendant] companies present at any job site while Mr. Welch was working there?

. . .

"*Q.3* Did Mr. Welch, while at those job sites, inhale and retain asbestos fibres from those asbestos-containing products which you have found were present and manufactured by the [defendants]?

. . .

"*Q.4* Was Mr. Welch's inhalation and retention of the asbestos fibres contained in the products manufactured by the [defendants] either the sole

trial judge's refusal to grant their motions for a directed verdict and for a judgment notwithstanding the verdict on the ground that there was insufficient evidence that Welch's injury was caused by exposure to their asbestos products. They also challenge the judge's admission of certain evidence and his instructions to the jury on damages. Keene further argues that Welch did not establish the corporation's failure to warn him of the inherent dangers of asbestos. Finding no merit to any of these contentions, we affirm the judgment.

1. *Denial of defendants' motions.* We turn first to the defendants' claim that it was error for the trial judge to deny their motions for a directed verdict and for a judgment notwithstanding the verdict. In reviewing the denial of a directed verdict or judgment notwithstanding the verdict, the question before us is the same: that is, whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Dobos* v. *Driscoll*, 404 Mass. 634, 656 (1989), quoting from *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972). The court may not substitute its judgment of facts for that of the jury. *O'Shaughnessy* v. *Besse*, 7 Mass. App. Ct. 727, 728 (1979). With these standards in mind, we set forth pertinent facts as the jury could have found.

Welch began work as an asbestos insulator for Local 6 of the Asbestos Workers Union of America in 1954. During a four and one-half year apprenticeship, he assisted insulators by carrying, applying, and mixing asbestos materials. Throughout his subsequent career as an insulator, he moulded thermal asbestos insulation to pipes, ducts, and

---

cause, or a substantial contributing factor in Mr. Welch's contracting asbestosis?

. . .

"*Q.5* Under the state of the art existing at the time of sale, were the asbestos-containing products of the [defendants] unreasonably dangerous to the user due to a failure to warn?

. . .

"*Q.6* Was such failure to warn on the part of the [defendants] the sole cause of, or a substantial contributing factor in, Mr. Welch's contracting asbestosis? . . ."

boiler room equipment at a variety of installations. Welch worked at "hundreds" of work sites, many of which involved the presence of Keene's and Owens' products.[3] As a result of his exposure to asbestos dust, Welch developed asbestosis.[4] After working for twenty-two years, he stopped in 1976, at the age of forty-three, because of his medical condition.

During the time of Welch's employment at four specific sites, including three in Massachusetts, Owens manufactured and supplied the insulating material "Kaylo."[5] Owens' Kaylo was used at a job site in Natick during 1955 and 1956, a time when the jury could infer that Welsh was also at that job site in his capacity as a pipe insulator. There was also evidence of Welch's working with Kaylo at three other specific sites. In short, the evidence showed that Welch used Owens' Kaylo many times throughout his career and as early as 1955; that is, more than three years before Owens ceased making and distributing the product.

Welch used Keene's or its predecessor firm, Baldwin Hill's, asbestos-containing cement at three specific installations over his career. He applied Baldwin Hill's High Temp cement to pipes at two specific sites, a radar station in 1955, and again in 1963 to 1964 at a hospital. In addition, Welch used Keene's "85% Magnesium Cement" for a period of several

---

[3]Owens manufactured and supplied the insulating material "Kaylo" in block and pipe covering forms. Kaylo had a product content of 15% "amacite" or "chrysotile" asbestos fiber. Keene was a producer of various insulating cements, one of which was known as "85% Magnesium Cement," and another, "High Temp Cement." Both Keene cements contained asbestos.

[4]"Asbestosis . . . is a latent disease that manifests itself 10 to 40 years after exposure to significant quantities of asbestos. Inhalation of asbestos fibers initiates a scarring process that destroys air sacs in healthy lung tissue. The result is a decrease in pulmonary function and lung volume. Symptoms associated with asbestosis include shortness of breath, coughing, chest pains and clubbing of fingers. Although the disease is not always fatal, it is progressive and incurable." Special Project, An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation, 36 Vand. L. Rev. 573, 579 n.10 (1983).

[5]Owens distributed Kaylo until April 30, 1958, at which point the company sold its Kaylo manufacturing facilities to the defendant Owens-Corning.

months in 1967 and 1968, at a power plant job site. There was also evidence brought in through lay witnesses that the mixing and application of these asbestos products typically caused the release of a substantial amount of asbestos dust into the air.

The evidence before the jury as to causation included expert testimony on the origins of asbestosis as well as the cumulative and potentially deadly effect of asbestos dust on human lungs over time. Other expert witnesses testified concerning the knowledge of the asbestos industry about the dangers of the product as early as the 1930's.[6]

The defendants' principal contentions are that, as matter of law, the evidence was insufficient on the identification, exposure, and causal relationship of the defendants' products to the plaintiff's illness and that the evidence did not establish a failure to warn.

a. *Identification.* The defendants claim that they were entitled to a directed verdict, or in the alternative, to a judgment notwithstanding the verdict due to Welch's failure to identify their specific products as the cause of his injury. Indeed, Welch's identification of the injurious product is a necessary element of his case. *Smith* v. *Ariens Co.*, 375 Mass. 620, 623 (1978). *Mathers* v. *Midland-Ross Corp.*, 403 Mass. 688, 691 (1989). It is enough, however, to reach the jury that Welch show that he worked with, or in close proximity to, the defendants' asbestos products. See, e.g., *Roehling* v. *National Gypsum Co. Gold Bond Bldg. Prod.*, 786 F.2d 1225, 1228 (4th Cir. 1986). A plaintiff may also demonstrate exposure to a specific product through testimony of coworkers who can identify him as working with or around these products. *Ibid.* See also 9 Travers, American Law of Products Liability § 113.34 (3d ed. 1988).

---

[6]Welch's principal expert witness, Dr. Gerrit Schepers, testified to the state of scientific, industrial, and medical knowledge concerning the risks and dangers inherent to asbestos in the period before Welch stopped working. He cited, among other studies, a 1930 article of two English doctors (Merriweather and Price) describing in "great detail" asbestosis, the conditions which made asbestos hazardous to inhale, and the measures which should be taken to protect workers.

Based on the evidence introduced by Welch, we conclude that he sufficiently identified the products of Owens and Keene. Several portions of the record, including Welch's own description of his direct application of asbestos products, among them Owens' Kaylo and Keene's cements, on "hundreds" of sites, support our conclusion.

b. *Causation.* Regardless of Welch's ability to identify their specific asbestos-containing products, the defendants argue that the alleged exposure was not substantial enough to cause his injuries. We point out that Welch is not required to prove that "but for" the particular product of each manufacturer, he would not have been harmed; rather, he need only show "that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the harm." Restatement (Second) of Torts § 433B(1) comment a (1965). See *O'Connor* v. *Raymark Indus., Inc.*, 401 Mass. 586, 589 (1988); *Payton* v. *Abbott Labs*, 780 F.2d 147, 156 (1st Cir. 1985). With a view of the evidence favorable to the plaintiff, *Cocco* v. *Deluxe Sys., Inc.*, 25 Mass. App. Ct. 151, 154 (1987), we think that it was reasonable for the jury to infer that Welch's exposure to the defendants' products was substantial and that their products caused his injury.

There is no factual basis upon which to conclude that Welch's exposure to the defendants' products was insignificant or de minimis. Welch established that the conditions of his working environment exceeded the generally accepted safe exposure levels for ultimate users of the products. More important, Welch offered expert testimony that his asbestosis was caused by the cumulative effect of all the dust that he had inhaled over the span of his career. Because each inhalation of asbestos dust can result in additional damage to lung tissue, it is all but impossible to determine which exposure is directly responsible for the disease; nor, we add, is it Welch's burden to allocate blame. See *Chase* v. *Roy*, 363 Mass. 402, 408 (1973); *O'Connor* v. *Raymark Indus., Inc.*, 401 Mass. at 591. Taking into account the testimony of Welch's experts, and giving the plaintiff's case the deference to which it is entitled, we find the evidence sufficient both to reach the jury

and for the jury to answer affirmatively, as they did, in response to special questions 2, 3, and 4 (note 2, *supra*). See, e.g., *Borel* v. *Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1094 (5th Cir. 1973), cert. denied, 419 U.S. 869 (1974) (where the plaintiff, an insulation worker, had been exposed to the products of several defendants over a number of years, the court held that from this "strong" circumstantial evidence the jury could find that each defendant was the cause in fact of some injury to him); *Sterling* v. *Velsicol Chem. Corp.*, 855 F.2d 1188, 1198-1201 (6th Cir. 1988) (on the basis of expert testimony, the nature of the plaintiffs' injury, numerous studies, and extensive literature, the court concluded that Velsicol's chemicals and the duration of exposure were 'capable' of causing the types of injuries complained of).

c. *Failure to warn.* Generally, a manufacturer's duty of care includes an obligation, whenever possible, to eliminate known or reasonably knowable conditions of the product, or to provide an adequate warning of the latent dangers arising from the normal and intended use of the product. *H.P. Hood & Sons* v. *Ford Motor Co.*, 370 Mass. 69, 75 (1976). *MacDonald* v. *Ortho Pharmaceutical Corp.*, 394 Mass. 131, 135 (1985). *Maldonado* v. *Thomson Natl. Press Co.*, 16 Mass. App. Ct. 911, 912 (1983). A manufacturer of a product which lacks the requisite warning is, by virtue of that deficiency, in breach of an implied warranty of merchantability. *Hayes* v. *Ariens Co.*, 391 Mass. 407, 413 (1984). *Yates* v. *Norton Co.*, 403 Mass. 70 (1988). However, a manufacturer has a duty to warn only as to those dangers about which the manufacturer actually knew or about which it reasonably should have known. See *Anderson* v. *Owens-Illinois, Inc.*, 799 F.2d 1, 4 (1st Cir. 1986).

Keene argues that Welch produced no evidence of its failure to warn.[7] Keene's failure to warn, however, was not an

[7]Owens chose not to brief the failure to warn issue. We consider only the question argued: viz., whether Welch established Keene's failure to warn. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). *Arenstam* v. *Planning Bd. of Tyngsborough*, 29 Mass. App. Ct. 314, 316 (1990).

issue at trial: rather, the manufacturer focused exclusively on whether the risks to insulators from asbestos products were generally knowable within the entire industry before Dr. I.J. Selikoff's well-publicized report of December, 1965.[8] Keene's counsel, in his opening statement, remarked that, before the 1965 study, the risk was "simply not known." In his closing argument, he elaborated, "The products couldn't possibly have been unreasonably dangerous by virtue of a failure to warn because there was nothing to warn about. . . . [T]he whole basis of [Welch's] claim, of course, drops out of the case once he knows about the risk and once warnings go on. And that happens in around the mid-1960's, December, 1965." See, e.g., Srebnick v. Lo-Law Transit Mgmt., Inc., 29 Mass. App. Ct. 45, 51 n.3 (1990) (an attorney's admission of material fact during argument is binding). Because Keene raised its breach of warranty defense on the theory that it had no duty to warn of an unknowable risk and because it failed to raise Welch's alleged failure to prove that he was not warned in the motion for a directed verdict, we need not pass on the issue on appeal. Uloth v. City Tank Corp., 376 Mass. 874, 882-883 (1978).

2. *Evidentiary rulings.* The defendants argue that they were also prejudiced by the admission of certain evidence. First, they challenge the allowance of Dr. Schepers' (note 6, *supra*) opinion as to what appropriate warnings might have been affixed to insulating products during the relevant pe-

---

[8]Selikoff, Churg, & Hammond, The Occurrence of Asbestosis Among Industrial Insulation Workers, 132 Ann. New York Acad. Sc. 139 (1965). This study was, according to Keene, the first to establish conclusively that insulators were at risk for asbestosis. However, in adopting the view of the evidence most favorable to Welch, the jury could have concluded from extensive expert testimony that by the year of Welch's entry into the workplace, 1954, the hazards were well known, documented and available to the asbestos manufacturing industry. Welch presented evidence that manufacturers of asbestos products could have known of the danger associated with exposure as early as the 1930's. It was a question of fact for the jury, whose finding we do not disturb. Cocco v. Deluxe Sys., Inc., 25 Mass. App. Ct. at 156-157.

riod.[9] There was no error. Expert testimony on matters within the witness's expertise is admissible whenever it will aid the jury, even if the expert's opinion touches on the ultimate issue that the jury must decide. *Everett v. Bucky Warren, Inc.*, 376 Mass. 280, 294 (1978). *Sacco v. Roupenian*, 409 Mass. 25, 28 (1990). Here, the expert's testimony as to the substance of appropriate warnings and possible precautions was nothing more than a relevant extension of his "state of the art" testimony. Where the jury were asked to determine whether the product, unaccompanied by adequate warnings, was unreasonably dangerous, the feasibility and substance of adequate warnings were facts material to the resolution of the ultimate issue. See *Fahey v. Rockwell Graphic Sys.*, 20 Mass. App. Ct. 642, 658 (1985).[10]

The defendants next question Dr. Schepers' use of a chart comprised of a redacted version of all the articles on asbestos which had been incorporated in his testimony. The judge allowed the chart as a demonstrative aid to help focus the attention of both the jury and the witness during his lengthy explanation of the literature. Summary charts of voluminous evidence are permissible if they are accurate and fair, although "care must be taken to insure that summaries accu-

---

[9]The judge refused to allow Welch to put in evidence an actual printed "sample" warning, but did permit the expert witness to testify that, based on the knowledge available in 1954, certain types of warnings might have been given to those working in the field. The judge was careful to narrow the scope of the expert's testimony on this issue, at one point saying, "I'm going to interrupt you. It's just a matter of words, but rather than say what you think they should have been, it's really what they could have been, based on what was available."

[10]The defendants further argue that the judge erroneously excluded legitimate attempts on their part to rebut the testimony of Welch's "state of the art" expert. However, the question they posed of their expert was: "Doctor, prior to the middle to late 1960's, was the state of the art, as reflected in the published literature such that a reasonable manufacturer *should* have known enough to warrant placing a warning. . ." (emphasis supplied). The judge struck the question because it touched on reasonable care, an issue properly left for the jury. After a bench conference, defense counsel evoked the appropriate standard: "Doctor, based upon the literature, was it knowable prior to the mid 1960's to late 1960's that insulators were at risk of asbestos disease?" As detailed in note 9, *supra*, the judge placed identical restrictions on Welch's expert concerning this issue.

rately reflect the contents of the underlying documents and do not function as pedagogical devices that unfairly emphasize part of the proponent's proof. . . ." *United States* v. *Drougas,* 748 F.2d 8, 25 (1st Cir. 1984). See also Proposed Mass.R.Evid. 1006. Nearly all of the articles and publications listed on the chart were disclosed and available to the defendants prior to trial. The judge carefully instructed the jury that the visual aids were not evidence and that, as they had been permitted to take notes, they were prohibited from copying any information from the chart. There was no error. See *Commonwealth* v. *Greenberg,* 339 Mass. 557, 581-582 (1959); 5 Weinstein & Berger, Weinstein's Evidence § 1006 (1983).

Finally, the defendants challenge on relevancy grounds the presentation to the jury of a videotaped experiment showing the visibility of dust concentrations. This demonstration was offered to support Welch's testimony that he observed at certain of his work sites harmful asbestos particles which exceeded acceptable exposure levels. The videotape was relevant: it established both Welch's exposure to the defendants' products when the dust had reached dangerous levels, and went to the attendant duty of the defendants to warn of the potential risks. Evidence of tests or experiments, which do not exactly replicate the conditions giving rise to the alleged injury, are admissible upon a showing of adequate test controls where there is a substantial similarity between experimental conditions and the conditions that gave rise to the litigation. *Griffin* v. *General Motors Corp.,* 380 Mass. 362, 365-366 (1980). *Calvanese* v. *W.W. Babcock Co.,* 10 Mass. App. Ct. 726, 731 (1980). The admission of "experiments or illustrations in the presence of the jury" rests on sound judicial discretion, see *Commonwealth* v. *Flynn,* 362 Mass. 455, 473 (1972), and cases cited. Here, we conclude, the judge did not abuse his discretion.

3. *The judge's instructions on damages.* Contrary to the defendants' argument, we find no suggestion in either *Griffin* v. *General Motors Corp., supra,* or *Trinity Church in the City of Boston* v. *John Hancock Mut. Life Ins. Co.,* 399

Mass. 43 (1987), that past lost earnings, like future lost earnings, should be discounted to present value. It has long been the rule that an award for loss of future earning capacity must be reduced to "present value" in order to allow for the earning power of that money. *Id.* at 52.[11] In addition to the projected future loss of earnings, the jury may also allow compensation for the plaintiff's past loss of earning capacity. *Doherty* v. *Ruiz*, 302 Mass. 145, 146-147 (1939). Since a jury award for past earnings covers the plaintiff's actual loss of use of his wages between the time of his injury and the date of his complaint, it rests on an entirely different footing. As such, we follow the cases which have specifically limited discounting to future lost earnings. See, e.g., *Griffin, supra* at 366-367. The judge's instruction was correct.

*Judgment affirmed.*

---

[11]The date by which to fix "present value" has been set as the date of the commencement of the action. *Griffin* v. *General Motors Corp.*, 380 Mass. at 367.